WILLIAM ROSS AND ALONZO ROSS *v.* THE STATE.

1. PRACTICE — CHARGE OF THE COURT.— If the court assumes and charges on a theory not raised or indicated by the evidence, it is radical error, and fatal to a conviction.

2. ARREST WITHOUT WARRANT is authorized by statute when, (1), the offense being a felony, or an offense against the public peace, it is committed in the presence or view of the officer; (2), when the offense, being a felony or breach of the peace, is committed in the presence or view of a magistrate, and he verbally orders the officer to arrest; and (3), when it is shown by satisfactory proof to the peace officer, by the representation of a credible person, that a felony has been committed, and that the offender is about to escape so that there is no time to procure a warrant.

3. SAME — MANSLAUGHTER.— An attempted unlawful arrest is deemed in law a provocation sufficient to reduce a killing in resisting it from murder to manslaughter.

4. SAME — EXCUSABLE HOMICIDE.— The citizen is authorized to stand upon his individual right, to oppose force to force in the prevention of an attempted wrong, and when he is threatened with unlawful arrest, he may not only use force, but can increase that force even to the killing of his adversary, if necessary to prevent the attempted wrong, and be held excusable. See the opinion *in extenso* on the subject.

5. Homicide in Defense of Property.— If a trespasser, unarmed, attempts a trespass upon the property of another, and neither intends nor attempts to commit a felony or inflict serious bodily harm, if the owner in resisting kills the trespasser unnecessarily and with a deadly weapon, he is guilty of murder.

6. Same.— But if the trespasser is armed and attempts to take the property by force, and manifestly intends to take the life of the owner if necessary to acquire possession of the property, his killing by the owner will be held to be excusable self-defense.   See the opinion *in extenso* on the question.

7. Same.— The general principle is that when one's person or property is unlawfully assailed, he is not required to yield in the least, but in all cases may stand upon his rights, taking care not to resort to greater violence than is necessary for their protection.

8. Homicide in Defense of Another.— To the same extent as he who is threatened with violence to his person or property, his brother may, in his behalf, resist the execution of the unlawful purpose. *Alford* v. *State*, 8 Texas Ct. App. 545, cited and approved.

9. Evidence.— See the opinion for evidence in this case *held* insufficient to sustain a conviction for murder in the second degree.

Appeal from the District Court of Williamson.   Tried below before the Hon. W. A. Blackburn.

The defendants were indicted for the murder of A. G. Hall, marshal of the town of Round Rock, Williamson county, on the 26th day of March, 1878.   Their trial, at the January, 1881, term of the District Court, resulted in their conviction of murder of the second degree, with punishment of each affixed at five years in the penitentiary.   The opinion sets out the material evidence in detail.

*Makemson, Fisher & Price,* for the appellants.

*H. Chilton,* Assistant Attorney General, for the State.

Hurt, J.   Appellants were tried for and convicted of the murder of A. G. Hall, and their punishment was assessed at confinement in the penitentiary for the term of five years.

We will give all of the evidence, in the language of the witnesses, bearing directly upon the homicide. This, we think, is necessary to a proper understanding of the legal principles which we think apply to the case.

A. W. Crosby testified for the State: "I knew A. G. Hall. He is dead. He was shot in Round Rock, Williamson county, Texas, about the latter part of March, 1878. He was marshal of the town of Round Rock at the time he was shot. I saw a part of the difficulty in which A. G. Hall was shot. It occurred across the street from my place of business, in front of what was then known as the 'Blind Tiger Saloon.' Quite a crowd was there, talking loud and making some disturbance. A. G. Hall came down the street to where the crowd was, and I walked across the street from my store to a point near the crowd; and as I walked up, I saw a man come out of the door of the 'Blind Tiger' with a gun in his hand. Hall was talking with this man. As the man came out of the door with the gun he brought the gun in a presented position, in both hands. Hall's back was towards the street, and he seemed to be watching the man in front of him with the gun. About this time I noticed a man who had leggings on move out in the street behind Hall. This man who had leggings on drew a nickel-plated six-shooter from his leggings and moved up in the rear of Hall, and, as I thought a difficulty was coming on, I went into a house near by, and immediately after I got in the house the firing began. I think that the man who drew the six-shooter from his leggings was the defendant Lon. Ross."

James Pickle, for the State, testified: "I was in Round Rock the day that A. G. Hall was shot, and saw the difficulty. I saw the defendants, William and Alonzo Ross, there in front of the 'Blind Tiger' at the time of the difficulty. William Ross had a Winchester gun, and Alonzo had a six-shooter. Quite a crowd was there.

Hall came up and ordered the crowd to disperse, and asked who was selling whiskey there, saying that he would find out if he had to break into the 'Blind Tiger.' After talking some time about the 'Blind Tiger,' he turned to the defendant William Ross, and said 'put up your gun.' William Ross replied: 'I have no place to put it; I am a stranger, and am waiting for my company to get ready, when we will leave town.' Hall then said, 'put it up,' and Ross asked if there was any law against carrying a gun. Lancaster then said 'I'll take the gun,' and Ross, reaching the gun towards him, asked, as Lancaster reached for it, 'will that do?' Hall reached for the gun at the same time, and Alonzo Ross pushed the defendant William Ross back, saying: 'Don't give up your gun, there is no law for it.' Hall drew his pistol, and it fired, striking a boy, who was sitting down in the street holding horses, in the leg. At this time William Ross was out in the street near the sidewalk, at the same point where he stood when Hall told him to put up the gun. Hall was on the sidewalk, and Alonzo Ross was to the left of William Ross, and to the right of Hall. Alonzo Ross drew his pistol from his boot and fired. This shot was fired immediately after that fired by Hall. The shot struck Hall, and I saw his arm fall as Alonzo Ross' pistol was discharged."

Cross-examined the witness testified: "At the time Hall ordered William Ross to put up his gun, defendants were quiet, and making no disturbance. A man in the crowd by the name of Clark was making a good deal of noise. Hall seemed to be considerably under the influence of whiskey. I did not see Alonzo Ross' pistol until after Hall had drawn his."

J. W. Barlow testified for the State: "I was coming down the street in Round Rock the day that A. G. Hall was shot, and came up to Hall on the sidewalk about seventy-five yards from the 'Blind Tiger.' There was a

crowd in front of the 'Blind Tiger,' and much loud talking, and Hall said that he would go down and quiet it. Hall and I walked down the street to where the crowd was gathered, and Hall said something about the 'Blind Tiger.' A man came out of the door with a gun in his hands, the firing commenced, and I got away."

B. J. Swenson, for the State, testified: "I know the defendants William and Alonzo Ross. I saw them in Round Rock on the day that A. G. Hall was shot. They came to my shop about ten or eleven o'clock in the morning, and said that they wanted to get a horse shod. Both of them wore leggings, one having on a hairy pair and the other a leather pair. They hitched their horses at my shop, and put their things, leggings, and baggage in my shop. My help and I went to dinner, and when we came back the defendants' horses and baggage were gone. When the defendants left my shop before dinner, one of them took his gun with him. It was late in the evening when the shooting occurred. I had gone home from my shop, after sundown. Immediately after the shooting, I saw the same defendant who took the gun away from the shop that morning run past my house with the gun."

Albert Higlesmith, for the State, testified: "I know A. G. Hall, and was in Round Rock the evening he was shot. At the time of the shooting I was about seventy-five yards from the place of shooting. There was a crowd of men in front of the 'Blind Tiger,' and several horses were standing between the crowd and myself, held by a young man. I could not see what was going on in the crowd. After several shots were fired, I think at the third shot, the man holding the horses fell. He was near the Steinbock corner, up the street from the 'Blind Tiger,' and between the crowd and me. After the firing began and the crowd dispersed, I saw A. G. Hall walk up the street, a few steps, and sit down on a box, saying he was shot. After Hall sat down on the box, I noticed a man

running diagonally across the street, who fired three shots from a gun at Hall as he sat on the box.   This man had on leggings.   A. G. Hall was sober at the time; had not been drinking for several months.   It is about sixty feet from Steinbock's corner to the front of the 'Blind Tiger.'"

J. W. Holt testified for the defendants: "I know the defendants William and Alonzo Ross.   I reside in Colorado county, Texas.   I was in Round Rock the day that the difficulty occurred between the defendants and A. G. Hall.   It took place in front of the 'Blind Tiger' saloon. I was standing in ten or fifteen feet of the place of the difficulty, at the time it occurred.   When Hall came up to the crowd he said something about breaking into the 'Blind Tiger,' and he and a man called Lancaster had some conversation about it.   Hall then turned to the defendant Wm. Ross, who was standing in the street near the sidewalk with his gun in his hand — Hall standing on the sidewalk facing him — and said to Wm. Ross, 'put up that gun' or 'give up that gun.'  Wm. Ross said: 'I am a stranger here, Captain, and don't know where to put it, and am just waiting for my company to get ready, when I will leave town.'  Hall then said in an abrupt, positive manner, 'give up that gun.'   Wm. Ross asked, 'is there any law against carrying a gun?' and Hall answered 'I command you to put up that gun.'   Lancaster stepped up and told Wm. Ross to give up the gun.   Wm. Ross reached the gun towards Lancaster, saying: 'Will that do, Captain?' and Hall reached towards the gun to take it.   At this time defendant Alonzo Ross stepped up to Wm. Ross and pushed him back, saying to Wm. Ross 'Don't give up your gun, you have violated no law.' Captain Hall then drew his pistol, and it fired in the direction of Wm. Ross.   I saw the flash of the pistol when it fired, and it seemed to be considerably depressed.   At the time Hall's pistol fired, he was on the sidewalk, near the outer edge facing towards the street.   Wm. Ross was

standing in the street in front of Hall, and about four or five feet from Hall. Alonzo Ross was a few feet to Hall's right. The shot from Hall's pistol hit Moram, who was standing out in the street holding some horses. I thought Hall shot Wm. Ross. It was getting dark at the time the shooting occurred. If Alonzo Ross drew his pistol before Hall's pistol fired, I did not see it. Hall's manner towards defendants was abrupt and harsh. At the time Hall accosted Wm. Ross, the defendants were creating no disturbance. At the time that Hall came down to the crowd a man named Clark was there, talking loud and making noise, but he left soon after Hall came. The defendants were strangers in Round Rock. Hall seemed to be drinking considerably. I was never in Round Rock until that day. I left as soon as the shooting began, and saw no more of the difficulty. I saw Alonzo Ross the next day at the house of my brother-in-law, seven or eight miles from Round Rock. He was shot in the shoulder. At the time Hall drew his pistol and fired, I thought he was shooting at Wm. Ross."

John Moram for the defense testified: "I know defendants, Wm. and Alonzo Ross, and was in Round Rock on the day of the difficulty between them and A. G. Hall. When the shooting began I was standing in the street near Steinbock's corner, about ten feet from the sidewalk, holding some horses. Myself and defendants were waiting for Ben Sander, who was in Steinbock's store, when we were all going out of town together. When Hall came to the crowd in front of the 'Blind Tiger,' he said something about selling whiskey, and breaking into the 'Blind Tiger.' He and Lancaster had some conversation. Hall then turned to defendant Wm. Ross, and asked, 'What are you doing with that gun?' William Ross answered, 'I am doing nothing with it.' Hall then said, 'put it up.' Ross replied, 'I am a stranger, and we are just ready to leave town.' Hall said, 'give up the gun.'

Lancaster said 'I'll take it,' and Wm. Ross asked Hall, 'will that do?' and reached the gun towards Lancaster. Hall reached out to take the gun, when Alonzo Ross stepped up and pushed Hall back with one hand and Wm. Ross with the other, saying to Wm. Ross: 'Bill, don't give up your gun — there is no law for it.' Hall then drew his pistol and it fired, hitting me in the thigh, breaking the bone. At the time Hall accosted Wm. Ross about the gun, Ross was standing in the street near the sidewalk with his gun in his hand, muzzle down, resting on his foot. I think Hall was standing on the sidewalk facing the street. Alonzo Ross was below Hall and Wm. Ross, and I was fifteen or twenty feet from them up the street towards Steinbock's corner. Defendants were making no disturbance when Hall accosted them. If Alonzo Ross had his pistol out before Hall's pistol fired, I did not see it. I think I could have seen it, if he had drawn it before. It was late in the evening — getting dark — at the time of the difficulty. The defendants were strangers in Round Rock, and had reached there only that day. Defendants lived in Bell county."

As applicable to these facts, the learned judge who presided at the trial below deemed it proper to give in charge to the jury the law relative to homicide committed to prevent arrests. Assuming (as did the learned judge below) that the case as made by the facts required such a charge, we will first notice the legal principles applicable thereto. 1st. If the homicide was committed in order to prevent a legal arrest, the charge upon that subject is not so objectionable. But if there be no evidence tending to show that the arrest was legal, a charge based upon that theory (in this case) is very obnoxious. While it is true that the charge should apply the law to every phase of the case, in some cases, and we think this is one, to assume a theory not raised or indicated by evidence and charge thereon would be very injurious to the rights of the defendant.

The deceased having no warrant for the arrest of either of these defendants, had he the right to arrest them or either of them without a warrant?

The right to arrest without warrant is derived from arts. 1047, 1048 and 1050, Code of Criminal Procedure. Under the first, if the offense be a felony, or an offense against the public peace, and is committed in the presence or view of the officer, he can arrest without warrant. Under the second, if a felony or breach of the peace is committed in the presence or in the view of a magistrate, and the magistrate verbally orders the arrest, a warrant is not required. And by the third, when it is shown by satisfactory proof to the peace officer, upon the representation of a credible person, that a felony has been committed, and that the offender is about to escape, so that there is no time to procure a warrant, such peace officer may, without warrant, pursue and arrest the person accused. If the authority in this case to arrest without warrant can be found at all, we must look to art. 1047.

And looking there we find that the person sought to be arrested must have committed a felony or an offense against the public peace, in the presence or view of the officer. After a close, yea, thorough examination of the evidence, we have been unable to discover the slightest circumstance tending to prove the commission of any offense by either of these defendants, in the presence or view of the officer, Hall, or at any other place. This being the case, that part of the charge based upon a supposed breach of the peace by these defendants is assuming, and is clearly calculated to impress the mind of the jury with the belief, that an offense had been committed by these defendants or one of them; and that therefore the officer, Hall, had the right to arrest them.

Hall, the deceased, having no right to arrest the defendants or either of them, what were the legal rights of the defendants, if, in preventing this illegal arrest, they or

either of them slew him? We think these are the correct rules:

1. The law of self-defense justifies the repelling of force by force in such cases, even unto death, but does not justify wanton or unnecessary aggression. If a person, in resisting an illegal arrest, makes use of a deadly and unnecessarily dangerous weapon, and with it slays his adversary, the crime is not, because of the use of a deadly weapon, or because the force used is greater or more violent than was required, raised above the grade of manslaughter. For the value the law sets upon the liberty of the citizen is so high that an attempt to arrest him unlawfully is regarded a great provocation, such as will reduce the killing to manslaughter. This principle is now well established. See the following cases: *Rex* v. *Curvan*, 1 Moody C. C. 132; *Roberts* v. *State*, 14 Mo. 146; *Com.* v. *Cary*, 12 Cush. 246; *Tackett* v. *State*, 3 Yerger, 392; *Galvin* v. *State*, 6 Cold. (Tenn.) 291; *Alford* v. *State*, 8 Texas Ct. App. 545.

2. As the law, divine and human, gives the citizen the right to stand upon his individual rights, and use force against force to successfully prevent the attempted wrong, the citizen whose liberty is thus unlawfully assailed can not only use force, but can increase that force and continue to increase it even to the death if necessary to prevent the attempted wrong, and if he slay his adversary he will be held excused. Otherwise, the lawless aggressor, the vindictive oppressor will be permitted to triumph over the rights and liberties of the citizen. Right will be made to do homage to wrong, and look to future redress in the courts of the country. This is not American law. The citizen has the right to maintain his liberty at all hazards, against any and all persons who attempt to invade it unlawfully, taking care not rashly to use or resort to greater violence than is necessary to its protection. Again, being in the right, he is permitted to anticipate the aggressor and prepare himself by drawing a weapon,

or making any other preparations, and if his life is imperiled or he is in danger of serious bodily harm, to use every means in the defense of his person or liberty. He is not required to permit his assailant to take the lead, and thereby give him the advantage, but, if the surroundings indicate a resort to a serious or deadly conflict on the part of the adversary, he can prepare to meet it, and if the adversary makes demonstration upon his life or liberty, or shows an intent to inflict serious bodily harm upon him, he can kill him and be held blameless by the law of the land.

The evidence in this case, we think, requires of us a statement of the law applicable to a defense against trespasses upon property; for, if the defendants or either of them had committed no offense and were not subject to an arrest, the deceased had no right to take the gun of William Ross from him, and when he attempted to do so, he became and was a trespasser upon his property. This being the case, what were the rights of the defendant ?

It is stated in the books that there is a difference in the law applicable to a defense against an unlawful arrest, and that applicable to a defense against trespasses against property; and that the difference consists in this:

"If a person resisting a trespass upon his property makes use of a *deadly* weapon, and with it kills the trespasser, it is murder, while in the other case it is ordinarily but manslaughter; but although a person resisting an illegal arrest makes use of a deadly weapon, and with it slays his adversary, the crime is not, because of the use of such deadly weapon, raised above the degree of manslaughter." The principle above enunciated, we without hesitation approve, with the proper explanation and modification. If the trespasser were unarmed, and simply attempts the trespass without force of arms, and neither intends nor endeavors to commit a felony nor to inflict serious bodily harm upon the owner in case he re-

sisted, to kill with a deadly weapon is, and in justice should be deemed murder.

But, suppose he is armed and attempts to take the property by force, and in order to be successful intends manifestly to kill the owner of the property, if necessary to accomplish his purpose, and is killed by the owner or any other person, this would be excusable self-defense. And although there was no intention to steal or rob, and therefore no felony in respect of the property, yet, as the intent was to kill the owner if necessary to accomplish the purpose, the felony would consist in the intention and attempt to kill the owner. Then, again, we find that in the protection of his property the citizen has the right to oppose force to force, and, if necessary to prevent the trespass, to take the life of the aggressor. The principle is this: When his person or property is assailed, he is not required to yield in the least, but in all cases may stand upon his rights, taking care not to resort to a greater degree of violence than is necessary to their protection. For, if the law will permit him to oppose slight force to slight force, why not the greatest violence if necessary to the protection of those rights? A contrary rule leads to a denial of the right in any case; for, if he can only go so far, and then yield to the aggressor, logic and common sense require that he should have yielded at the first. *Payne's Case*, Horr. & Thomp. Self Def. 863 and 900, note 1; *The People* v. *Herbert*, 24 Wend. 369; *Curtis* v. *Herbert*, 1 Hill (S. C.), 336; 4 Hill, 437.

We do not think that these principles were applied to the case by the court below in its charge to the jury. As to the right of Alonzo Ross to act in the protection of the life, liberty and property of his brother William, there can be no question. He, to the same extent that William, could oppose force to force, and, if required to prevent the accomplishment of the unlawful purpose, take the life of the assailant. (See this question ably and ex-

haustively discussed by Judge Clark in the Alford case, 8 Texas Ct. App. 545.)

The defendants were convicted of murder in the second degree. This conviction, and the judgment thereon, are not supported by the evidence. Horr. & Thompson Self. Def. p. 717.

The other points raised by counsel in their very able brief will not be discussed, believing that the principles above stated, if properly applied, will suffice.

For the errors above indicated, the judgment is reversed and the cause remanded.

*Reversed and remanded.*